STATE of Missouri, Respondent,

v.

Andrew J. OSTDIEK, Appellant.

Nos. WD 72397, WD 72398, WD 72399.

Missouri Court of Appeals,
Western District.

Aug. 30, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 4, 2011.

Application for Transfer Denied
Dec. 6, 2011.

Jeffrey Scott Eastman, Gladstone, MO, for appellant.

Ellen Greenberg Jacobs and Scott A. Ison, Kansas City, MO, for respondent.

Before Division Two: JAMES M. SMART, JR., P.J., MARK D. PFEIFFER and CYNTHIA L. MARTIN, JJ.

JAMES M. SMART, JR., Judge.

Appellant Andrew Ostdiek appeals his conviction of driving while intoxicated, exceeding the posted speed limit, and possession of drug paraphernalia. Ostdiek claims: that the Clay County Sheriff's Department lacked the authority to make a traffic stop for speeding on a Kansas City, Missouri street; that there was insufficient evidence to support the conviction of speeding; that the court erred in admitting evidence of the results of the horizontal gaze nystagmus test; and that the results of his breathalyzer test should have been excluded because the deputy administering the test lacked proper authority to perform the tests. We affirm in part and reverse in part.

### Statement of Facts

Deputy Alyssa Ryder (hereafter, "Deputy") of the Clay County Sheriff's Department was patrolling the area of 72nd Street and Brighton Avenue, an area within the City of Kansas City, and Clay County, Missouri, on April 17, 2009. While on patrol, she stopped Andrew Ostdiek for speeding. Deputy was heading northbound on Brighton Avenue when Ostdiek passed by her, heading southbound, "traveling [at a rate] a little bit faster than normal." She activated her emergency lights, turned her vehicle around, and pursued Ostdiek. The posted speed limit in the area was 40 mph. Her radar gun registered Ostdiek traveling 16 mph over the posted speed limit.

After stopping Ostdiek just north of 72nd Street on Brighton Avenue, Deputy ran his license plate and determined there was a warrant out for Ostdiek's arrest in Gladstone, Missouri. Upon confirming the validity of the warrant, Deputy made contact with Ostdiek. Deputy engaged Ostdiek in conversation, advising him that he had an outstanding warrant in Gladstone.

As they conversed, she noticed a strong odor of alcohol emanating from Ostdiek and his vehicle. Deputy also noticed that Ostdiek's eyes were bloodshot.

Deputy had Ostdiek exit his vehicle. She escorted him to the front of her patrol car, placed him in handcuffs for the Gladstone warrant, situated him in the back of her patrol car, and then began to look inside Ostdiek's vehicle. Deputy observed pills in the center console, in plain sight. She also found a glass pipe commonly used to smoke marijuana in the glove box. The pipe contained a green leafy residue-type substance in the bell of it, which she believed to be marijuana.

Having found pills and a pipe, and smelling alcohol on Ostdiek, Deputy decided to conduct some standard field sobriety tests. Apparently finding the location of the stop dangerous and unsuitable for administering all of the standard field tests, she decided to conduct only the horizontal gaze nystagmus ("HGN") test on Ostdiek. Deputy took Ostdiek back out of the patrol car, uncuffed him, and began checking his eyes for nystagmus.

While administering the HGN test, Deputy noticed a lack of smooth pursuit in each eye. She observed that Ostdiek had nystagmus at maximum deviation and also the onset of nystagmus prior to a forty-five degree angle. She therefore concluded that Ostdiek was intoxicated, based on the emanating odors and his performance on the HGN test, and handcuffed him for a second time, arresting him for driving while intoxicated.

Once back at the Sheriff's Department, Ostdiek told Deputy he had consumed two glasses of whiskey around 9:00 p.m. Ostdiek had been stopped by Deputy at 10:22 p.m. He also admitted to smoking three grams of marijuana and taking Hydrocodone pills earlier in the day.

Deputy read the Missouri implied consent law to Ostdiek and asked him if he would submit to a chemical breath test (breathalyzer test). Ostdiek did not refuse and she administered the test. The results from the test revealed a blood alcohol concentration of .114 percent.

Subsequently, Ostdiek was charged by information with driving while intoxicated,[1] exceeding the posted speed limit by driving 56 mph in a 40 mph zone,[2] and possession of drug paraphernalia.[3]

Prior to trial, Ostdiek filed a Motion to Suppress challenging the legality of the stop. The court conducted a suppression hearing on October 28, 2009, at which Deputy testified. The State sought to introduce Deputy's testimony regarding the use of a radar gun to determine the speed of Ostdiek's vehicle. However, the trial court sustained Ostdiek's objection concerning the admissibility of the radar gun results because Deputy had no knowledge of any calibration tests performed on the radar gun itself, besides the self-check the gun conducts on itself when first activated. Nevertheless, Deputy was still allowed to testify that based upon her experience and observation, the vehicle was traveling faster than the "normal rate of speed."

At the conclusion of the evidentiary hearing, Ostdiek argued that Deputy, as a member of the Clay County Sheriff's Department, lacked authority to effect a traffic stop as to a municipal ordinance violation. The argument was premised upon the absence of an agreement between the sheriff and the city council, and approved by the county commission, authorizing the

---

1. § 577.010, RSMo 2000.

2. § 304.010, RSMo 2010 Cum.Supp.

3. § 195.233, RSMo 2000.

Sheriff's Department to enforce the municipal laws. On cross examination, Deputy acknowledged that the road on which she stopped Ostdiek was a city street and not what she would consider a state highway or interstate highway. The trial court, however, disagreed with Ostdiek's argument, stating that it believed that a deputy sheriff has the authority to stop an individual on a city street if the individual is violating state law. Furthermore, the trial court found that because Deputy could see Ostdiek speeding, probable cause existed to stop his vehicle without taking into account any evidence from the radar gun. The Motion to Suppress was subsequently denied, and the matter was set for bench trial.

On February 24, 2010, the court conducted a bench trial on the charges of exceeding the posted speed limit, possession of drug paraphernalia, and driving while intoxicated. During the trial, the State continued its efforts to try and secure admission of the radar reading. However, the trial court once again sustained Ostdiek's objection on foundational grounds,[4] and Deputy's testimony was restricted to her observation of Ostdiek's purported speed.

Ostdiek also objected to the admission of the results of the HGN test conducted by Deputy, claiming that there was a lack of evidence that she was qualified to administer the test. Deputy testified that she had taken several different training classes on the HGN test and she "had too many" hours of training to recall the exact number. She further stated she had taken "two or three classes in the past year or two." The last class she had taken consisted of a total of twenty-four hours of standardized field sobriety testing, but she could not recall the exact number of hours dedicated solely to the HGN test. Deputy stated, however, that she did have the minimum number of hours required to administer the HGN test. The trial court, therefore, overruled Ostdiek's objection.

Deputy proceeded to describe, in detail, what clues an officer is to look for during the HGN test and the process in determining each. She testified that Ostdiek exhibited six clues in total and that she only needed four to make an arrest. While Ostdiek continued to object to Deputy's testimony regarding the HGN test for insufficient foundation, the trial court continued to overrule the objection and allowed her to finish her testimony regarding the HGN test.

Finally, Ostdiek challenged the admission of the breathalyzer test results, claiming Deputy lacked the requisite statutory or regulatory authority to administer the test in that she possessed no permit from the Department of Transportation. At the time the test was administered, Deputy held a permit issued by the Missouri Department of Health and Senior Services, effective April 10, 2008. Ostdiek's objection was overruled.

Sometime before Ostdiek's arrest, Sergeant Donnie St. John of the Clay County Sheriff's Department had performed a maintenance check on the same DataMaster used for Ostdiek's breathalyzer test. He performed this check pursuant to a permit issued to him by the Missouri Department of Health and Social Services.

---

4. Deputy was allowed to testify regarding the radar results during the State's examination of her on the condition that a foundation would be laid for her testimony through Sergeant Donnie St. John, who was supposed to certify the results. When Sergeant St. John testified, he stated he did *not* perform the radar certification himself, but instead outsourced the responsibility. The trial court once again sustained Ostdiek's foundational objection to the admission of the radar reading.

Ostdiek again objected to admission of the breathalyzer test results, claiming Sergeant St. John lacked statutory or regulatory authority from the Department of Transportation to conduct such maintenance. The objection was overruled, and the DataMaster result of .114 percent was admitted. The State rested. Ostdiek's motion for acquittal at the close of evidence was denied. Ostdiek did not testify or offer other evidence. Ostdiek again moved unsuccessfully for acquittal.

The court found Ostdiek guilty and sentenced him. On the driving while intoxicated conviction, he was sentenced to 180 days in the Clay County Jail. (Execution of that sentence was suspended, and he was placed on two years of probation.) For the Possession of Drug Paraphernalia conviction, he was assessed a fine of $200.00. And for the speeding charge, he was assessed a fine of $78.50.

From such judgments, Ostdiek filed an appeal.[5]

### Point I

■■■ In his first point on appeal, Ostdiek claims that the trial court erred in denying his motion to suppress all evidence obtained by Deputy during the traffic stop, because Deputy lacked the authority to make a traffic stop for speeding in violation of section 304.010, RSMo.[6] When considering a trial court's denial of a motion to suppress, appellate courts consider "the evidence presented both at the suppression hearing and at trial in determining whether the motion should have been granted." *State v. Goff*, 129 S.W.3d 857, 861–62 (Mo. banc 2004). We consider all the evidence and reasonable inferences in the light most favorable to the circuit court's ruling and defer to the circuit court's factual findings and credibility determinations. *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007); *Goff*, 129 S.W.3d at 862. We will reverse a circuit court's ruling on a motion to suppress only if the decision is clearly erroneous and not supported by substantial evidence, leaving us with a definite and firm impression that a mistake has been made. *State v. Dixon*, 218 S.W.3d 14, 18 (Mo.App.2007); *see State v. Edwards*, 116 S.W.3d 511, 530 (Mo. banc 2003). However, although we review the circuit court's conclusions as to the historical facts under a clearly erroneous standard, the issue of whether or not the Fourth Amendment has been violated is an issue of law that we review *de novo*. *State v. Peery*, 303 S.W.3d 150, 153 (Mo. App.2010).

Specifically, Ostdiek contends that North Brighton is a municipal thoroughfare lying within the corporate limits of the City of Kansas City, Missouri, and that section 304.010 does not apply to roadways that are regulated by city ordinances, such as North Brighton. It is undisputed that North Brighton had a posted speed limit of 40 mph. Because Deputy premised her speeding stop of Ostdiek on section 304.010, and Ostdiek argues that section 304.010 does not give her jurisdiction or authority to make such a stop on a municipal roadway, he contends that Deputy's stop was an unreasonable search and seizure under the Fourth Amendment to the United States Constitution and Article I, Section 15 of the Missouri Constitution. Therefore, Ostdiek argues, all evidence resulting therefrom should be suppressed.

---

5. The cases, although treated and tried together, were assigned separate case numbers at the trial court level. The cases were formally consolidated in this court for unitary review.

6. Statutory references are to the Revised Statutes of Missouri 2000, as updated by the 2010 Cumulative Supplement, unless otherwise stated.

The State argues that Deputy had authority under section 304.010 to stop Ostdiek. Section 304.010.2 provides, *inter alia*, that "no vehicle shall be operated in excess of the speed limits established pursuant to this section[.]" Section 304.010.4 states, in part, that "cities, towns and villages may regulate the speed of vehicles on state roads and highways within such cities', towns' or villages' corporate limits by ordinance with the approval of the state highways and transportation commission." Because the speed limit had been posted by the municipality, it is presumed that the municipality properly, by ordinance, adopted the speed limit for North Brighton. Section 304.010.2(6) states "[f]or the purposes of enforcing the speed limit laws of this state, it is a rebuttable presumption that the posted speed limit is the legal speed limit."

The State thus argues that, accordingly, the Sheriff's Department "does not lose authority to enforce [section 304.010] because the speed limit on a road might have been determined by a municipality." The traffic stop took place within Clay County, Missouri. The State also insists that even if a municipal ordinance exists establishing the speed limit, and not a state law, section 304.010 makes it a violation of state law to exceed the speed limit. We agree.

Section 304.010 refers to speed limits on state roads and "highways." "Highway" is defined for Chapter 304[7] as "any public thoroughfare for vehicles, including state roads, county roads and public streets, avenues, boulevards, parkways or alleys *in any municipality*." § 301.010(19) (emphasis added). "This definition originally appeared in Section 3, L.1921, 1st Ex.Sess., p.76, a new chapter that regulated motor vehicle registration, ownership, operation, equipment, use, safety and traffic on the highways." *Covert v. Fisher*, 151 S.W.3d

70, 74 (Mo.App.2004). While the legislature has expanded the provisions regulating motor vehicles and separated the provisions into different chapters over the years, it has *continued* to define "highway" using identical language. *Id.* at 75 (listing relevant Missouri statutory history of "highway" definition). In 1930, the Missouri Supreme Court construed "highway," as defined in the 1921 statute, to apply to "any roads of the state where the public is accustomed to travel." *Id.* (citing *Phillips v. Henson*, 326 Mo. 282, 30 S.W.2d 1065, 1068 (1930)). The *Phillips* Court found that the word "highways," as used in the statute, was used "in its popular rather than its technical sense," meaning all public roadways of the state, including streets in a municipality. *See Phillips*, 30 S.W.2d at 1068. Missouri courts, and the legislature, have continued applying this definition of "highway" to the statutes in chapters 301, 302, 304, and 307, ever since. *See, e.g., State v. Dunn*, 147 S.W.3d 75, 78 (Mo. banc 2004); *State ex rel. Audrain County v. City of Mexico*, 355 Mo. 612, 197 S.W.2d 301, 303 (1946); *City of Clayton v. Nemours*, 353 Mo. 61, 182 S.W.2d 57, 60 (1944); *State v. Dienstbach*, 313 S.W.3d 201, 204 (Mo.App.2010).

In particular, the Missouri Supreme Court, continuing with the *Phillips* Court's original interpretation, affirmed in 2004 (with no changes in the statutory definition since that case) that the word "highway" means "all highways traveled by the public, regardless of their legal status." *Dunn*, 147 S.W.3d at 78. "The fact that the legislature has [continued] the definition of 'highway,' which *Phillips* construed in 1930, to the present day, reenacting it numerous times in motor vehicle and drivers license statutes, indicates that it adopted the construction the courts

---

7. Sections 304.010 to 304.040 and 304.120 to 304.260.

have given to this definition." *Covert,* 151 S.W.3d at 76. When a familiar rule has received a settled judicial construction from the courts of last resort in the state, if the legislature re-enacts it, carries it over without change, or re-incorporates the language construed, "it will be presumed that the legislature knew of and adopted this construction." *Duckworth v. United States Fid. & Guar. Co.,* 452 S.W.2d 280, 286 (Mo.App.1970); *see also Citizens Elec. Corp. v. Dir. of Dep't of Revenue,* 766 S.W.2d 450, 452 (Mo. banc 1989). In addition, "we presume that the legislature intended for every word, clause, sentence, and provision of a statute to have effect," as the "legislature does not insert idle verbiage or superfluous language in the statute," and therefore we "give meaning to each word or phrase of the statute whenever possible." *Moore v. State,* 318 S.W.3d 726, 734 (Mo.App.2010). Thus, we must presume that the Missouri legislature was aware that the legally operative definition of "highway" included public roads and streets, such as North Brighton, when it included the term "highway" in section 304.010.4, which allows cities, towns and villages to regulate the speed of vehicles on "state roads and highways" by ordinance.

No language in section 304.010 restricts the authority of the state highway patrol or county sheriff's offices from enforcing the laws of the state (section 304.010 included). The statute *does not* proclaim that a municipal ordinance regulating speed limits within a city, town, or village renders state law devoid of application. In fact, to the contrary, state law adopts the speed limit set by the local government entity. The statute does not restrict enforcement to law enforcement officers of that local entity. Nor does the statute say it applies only to certain types of roads within the state-it applies to all vehicles operated in excess of the posted speed limit on state roads and highways ("any public thoroughfare for vehicles, including state roads, county roads and public streets, avenues, boulevards, parkways or alleys *in any municipality*"). *See* § 301.010(19); § 304.010.2; § 304.010.4. The statute further states that "[f]or the purposes of enforcing the speed limit laws of this state, it is a rebuttable presumption that *the posted speed limit* is the legal speed limit," regardless of whether the speed limit was set by a city, town, or village under this section. § 304.010.2(6) (emphasis added); § 304.010.4.

 "[Where] a municipality [is] organized under the statutes of this state, *its power to enact ordinances is derived from the state* and must be exercised under the authority granted to it by the state." *City of Richmond Heights v. Shackelford,* 446 S.W.2d 179, 180 (Mo.App.1969) (emphasis added). Section 71.010 requires that a Missouri municipal corporation confine and restrict its jurisdiction and the passage of its ordinances to and in conformity with the state law upon the same subject. *See also State ex rel. Hewlett v. Womach,* 355 Mo. 486, 196 S.W.2d 809, 812 (Mo. banc 1946) ("It is a familiar rule that municipal ordinances regulating subjects, matters and things upon which there is a general law of the state must be in harmony with the state law upon the same subject."). Section 304.010.2 states that *"no vehicle shall be operated in excess of the speed limits established pursuant to this section* [.]" (Emphasis added.) Because the cities, towns, and villages derive their authority to set the speed limits within their jurisdictional limits by ordinance under section 304.010.4, driving in excess of that posted speed limit, as Ostdiek did, becomes a violation of state law. *See City of Lake Lotawana v. Meagher,* 581 S.W.2d 105, 106 (Mo.App.1979) (finding that a city has no inherent police powers and its authority

must come from a specific delegation by the state).

Ostdiek's proposed construction of section 304.010, that as soon as a municipal ordinance is enacted the only violation that can occur is under that ordinance, is incorrect. Section 304.010.4 states that cities, towns, or villages *may* regulate speed by ordinance. If a city, town, or village decides *not* to exercise this authority, regulation of the speed limits on state roads and highways would either fall to the county, as provided for in sections 304.010.5, .6, or the state, under section 304.010.3. In any event, section 304.010 gives the state the right to enforce speed limits set by local subdivisions.

Ostdiek's position is that section 304.010 applies *only* "to state roadways and highways and those county and municipal thoroughfares which are part of the state system." For the reasons stated above, this assertion is manifestly wrong. While section 304.010 allows cities, towns, and villages the authority to *regulate* speed limits within their jurisdiction, the statute grants the state authority, and thereby the county sheriff, to *enforce* the speed limits set pursuant to this section.

Ostdiek does not deny that Deputy had jurisdiction to enforce the laws of the state within Clay County. Clay County's Code of Ordinances, section 70.11, states, "[t]he state traffic laws regulating the speed of vehicles shall be applicable upon all roads within the county." *See* Clay County, Mo., State speed laws applicable to county roads, Ord. No.2005–ORD–33 (Jul. 25, 2005). Further, section 70.02 of Clay County's Code notes, "[i]t shall be the duty of the sheriff to enforce all traffic laws and

orders of the county." Clay County, Mo., Duties of sheriff; directing traffic, Ord. No.2005–ORD–33 (Jul. 25, 2005). Section 304.010, being a state law, is therefore applicable to North Brighton. Deputy had authority and jurisdiction to stop Ostdiek pursuant to 304.010.

In spite of all this, Ostdiek replies further that section 57.101 [8] requires a written agreement between the municipality and the county in order to give a county sheriff the same authority as a municipal police officer to enforce municipal ordinances. He notes that no agreement between the City of Kansas City and Clay County was presented to the court. This argument, however, obviously misses the mark because Deputy was *not* purporting to enforce a municipal ordinance. Instead, Deputy's citation recited that she was enforcing section 304.010, a state statute. We find no error. Point I is denied.

### *Point II*

In Point II, Ostdiek contends that the trial court erred in finding him guilty of speeding because the only evidence presented was the "uncorroborated opinion testimony" of Deputy, which is insufficient evidence as to Ostdiek's speed.

The standard of review in a court-tried case is the same as in a jury-tried case. *State v. McKinney*, 253 S.W.3d 110, 113 (Mo.App.2008). "In reviewing the sufficiency of the evidence in a court-tried criminal case, the appellate court's role is limited to the determination of whether the state presented sufficient evidence from which the trier of fact could have reasonably found the defendant guilty [be-

---

8. "A county sheriff and his deputies, when authorized by written agreement entered into by the sheriff and a city, town or village within the county and approved by the governing body of the county, shall have the same power and authority to enforce the ordinances of the city, town or village, and in the same manner, as have the police of the city, town or village." § 57.101.

yond a reasonable doubt]." *State v. Vandevere*, 175 S.W.3d 107, 108 (Mo. banc 2005). "The Court examines the evidence and inferences in the light most favorable to the verdict, ignoring all contrary evidence and inferences." *Id.*

▇▇▇ The prosecution, of course, is not entitled, in the absence of a stipulation to the contrary, to rely upon testimony from the suppression hearing to support the conviction. *See State v. Fuente*, 871 S.W.2d 438, 442–43, 444 (Mo. banc 1994). There was no such stipulation here. The State does seek to rely in part on the transcript from the motion to suppress hearing; but as to the issue of the sufficiency of the evidence to convict Ostdiek of speeding, we must disregard the evidence from the suppression hearing.

In this regard, we have an advantage over the trial judge. Despite the trial court's efforts, some of the impressions from the suppression hearing tended inexorably to merge with the trial testimony in the mind of the trial court. Therefore, in determining whether substantial evidence existed as to Ostdiek's guilt of speeding, it is especially important that we identify the differences in the evidence presented in the two hearings and separate the facts and impressions arising from the suppression hearing in considering the prosecution's case on the merits.

Because the radar reading was not admitted at trial, and because there was no testimony that Deputy followed Ostdiek and was thereby able to gauge his speed, the only evidence before the court regarding Ostdiek's purported speed was a weaker explanation as to why she believed he was speeding.

Deputy's direct testimony regarding Ostdiek's speed was as follows:

Q: When did you first believe [Ostdiek] was speeding?

A: Probably as I saw the vehicle approaching me and as the vehicle passed.

. . . .

A: It just appeared the vehicle was going faster than what I was traveling on that road, or what I had seen other cars passing me at that moment and that night.

During cross examination, Deputy testified that she could not recall how fast she was traveling before she pulled over Ostdiek or how fast the other vehicles were traveling that she had seen passing her that night. Over the course of her entire testimony, Deputy never gave an opinion as to Ostdiek's speed, or even his approximate speed, as he drove past her.[9]

The Missouri Supreme Court in *City of Kansas City v. Oxley*, 579 S.W.2d 113 (Mo. banc 1979), held that an officer's visual estimate regarding a driver's speed alone *did not* in that case constitute substantial evidence of guilt for speeding when the officer testified that the driver was traveling 45 mph in a 35 mph zone. *Id.* at 116. The Supreme Court did not hold that an "officer's opinion testimony alone can *never* constitute substantial evidence of speeding; rather, the Court held that *under the facts of that case* the officer's uncorroborated opinion testimony alone that the defendant was exceeding the speed limit did not constitute substantial evidence of speeding." *State v. Kimes*, 234 S.W.3d 584, 587 (Mo.App.2007) (citing *Oxley*, 579 S.W.2d at 116) (emphasis added); *see City of Jackson v. Langford*, 648 S.W.2d 927, 930 n. 3 (Mo.App.1983) ("Some writers have suggested that a speeding case can never be made with opinion evidence alone. We do not read *Oxley* that broad-

---

9. Deputy's testimony as to her radar gun reading was excluded because no foundation had been laid for the admission of the radar results.

ly."); *see also State v. Cusumano*, 819 S.W.2d 59, 60 n. 2 (Mo.App.1991) ("[W]e read *Langford* and *Oxley* to stand only for the proposition that the specific, uncorroborated opinion evidence involved in those cases did not rise to the level of substantial evidence."). Recently, in *Kimes*, the Southern District found the opinion testimony of a police officer alone was enough to affirm the driver's speeding conviction when the officer testified that the driver was traveling 35 mph in a 20 mph zone. 234 S.W.3d at 589–90.

 Deputy's testimony that the Ostdiek's vehicle "just appeared" to be going faster than her vehicle and the other vehicles on the road is not sufficient to authorize a finding of guilt beyond a reasonable doubt in the absence of other evidence. Deputy did not remember how fast she (or any other cars on the road that night) was traveling. Faced with the fact that the only evidence that could support the verdict was not sufficient to persuade a reasonable fact-finder beyond a reasonable doubt of Ostdiek's guilt, we hold that the verdict of guilt for speeding must be reversed.[10]

### *Point III*

 In his third point on appeal, Ostdiek claims the trial court erred in admitting into evidence the results of the field sobriety horizontal gaze nystagmus ("HGN") test[11] because the State failed to

---

**10.** The reversal of the speeding conviction does not affect the legitimacy of the initial traffic stop or any evidence which resulted from that stop. First, the standard of review as to the issue of guilt is whether there is evidence from which a reasonable fact-finder could find guilt beyond a reasonable doubt, whereas the standard of review as to the suppression ruling is only whether the trial court ruling on reasonable suspicion was "clearly erroneous" as to credibility and factual determinations, and legally correct as a matter of law as to the legal concept of "reasonable suspicion." *See State v. Grayson*, 336 S.W.3d 138, 142 (Mo. banc 2011). Second, at the suppression hearing, Deputy provided more details as to Deputy's reasonable suspicion that Ostdiek was engaged in the criminal activity of speeding in excess of section 304.010, such as Deputy's testimony that she pursued Ostdiek and was able to judge his speed while in pursuit. While Deputy did *not* provide similar testimony *at trial*, the trial court correctly concluded that there was sufficient evidence of "reasonable suspicion" presented at the *suppression hearing* to justify the initial traffic stop. *See State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005) ("When reviewing the trial court's overruling of a motion to suppress, this Court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling.") Of course, under the principles first addressed in *Terry v.*

*Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), " 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot ...,' the officer may briefly stop the suspicious person and make 'reasonable inquiries[.]' " *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (quoting *Terry*, 392 U.S. at 30, 88 S.Ct. 1868). Under this lens, the trial court correctly concluded that the evidence from the suppression hearing and at trial combined to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" Deputy's initial *Terry* stop. *See Terry*, 392 U.S. at 21, 88 S.Ct. 1868.

**11.** The HGN test was first adopted as an accepted test and described in detail by this court in *State v. Hill*, 865 S.W.2d 702, 704 (Mo.App.1993), *overruled on other grounds by State v. Carson*, 941 S.W.2d 518, 520 (Mo. banc 1997). The test was described as follows:

> Nystagmus is an involuntary jerking of the eyes. Under the HGN test, an individual's eye movements are tested as a means of determining whether they are under the influence of alcohol. A suspect is required to follow an object such as a finger or pen with his eyes as the object is moved laterally along a horizontal plane to the periphery of the suspect's vision. Dr. Burns testified that there are three separate indicators that

lay a proper foundation for Deputy's qualifications to administer the test. Specifically, he claims Deputy could not articulate how many hours of training she had received specific to the HGN test. In addition, Ostdiek contends Deputy did not correctly describe or conduct significant parts of the HGN test, including: looking for distinct and sustained nystagmus at maximum deviation, her unwillingness and seeming inability to articulate the difference between equal tracking and smooth pursuit, and her inability to describe the exact distance she held her stimulus when looking for nystagmus prior to a forty-five degree angle.

"Trial courts have broad discretion in determining whether to admit or exclude testimony." *State v. Rose*, 86 S.W.3d 90, 98 (Mo.App.2002). "The admissibility of [such] evidence lies within the sound discretion of the trial court and will not be disturbed absent abuse of discretion." *Nelson v. Waxman*, 9 S.W.3d 601, 603 (Mo. banc 2000). Such abuse occurs when the trial court's ruling is clearly against the logic of the circumstances and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration. *Id.* at 604. "Before an officer is free to state his or her opinion as to the driver's performance of the HGN test ... an adequate foundation must be established. This consists of showing 1) that the officer is adequately trained to administer such test and render an opinion; and 2) that the test was properly administered." *Rose*, 86

S.W.3d at 98 (citing *Duffy v. Dir. of Revenue*, 966 S.W.2d 372, 378–79 (Mo.App. 1998); *State v. Hill*, 865 S.W.2d 702, 704 (Mo.App.1993)). Accordingly, the determination of whether a sufficient foundation was laid for Deputy's testimony as to Ostdiek's performance on the HGN test was within the sound discretion of the trial court. *See id.*

In *Hill*, and later reaffirmed in *Rose*, this court concluded that "adequate training [to administer the HGN test] consist[ed] of a minimum of eight hours of police training on how to administer and interpret the HGN test." *Rose*, 86 S.W.3d at 98 (quoting *Hill*, 865 S.W.2d at 704). The *Rose* court, addressing the adequacy of the officer's qualifications to administer the HGN test, found that the officer's testimony that he had "received approximately twenty hours of training on the HGN test" laid a sufficient foundation for admission of the officer's testimony concerning the results. *Id.* at 99. Here, Deputy testified at length regarding her qualifications to administer the HGN test. When asked how many hours of training she had regarding only the HGN test, Deputy stated, "[t]oo many to recall. I've had two or three classes in the past year or two." While she could not recall the specific number of hours of HGN test training she had received, just like the officer in *Rose*, Deputy testified "[a]ll I know is that I have *the minimum*, or requirement for what we're supposed to have to be able to administer the standardized field sobriety

an officer looks for under the HGN test. First, an officer observes how smoothly a suspect follows the object as it is moved to the periphery of the suspect's vision. Jerking of the eyes rather than the ability to follow the object smoothly indicates the influence of alcohol. Second, an officer observes whether or not a distinctive jerking occurs in the eyes at the maximum point of deviation when the eye moves to the far periphery of vision. Distinctive jerking is indicative of the influence of alcohol. Third, an officer observes the angle at which nystagmus occurs. Nystagmus occurring at or before the eye is looking at a 45–degree angle is indicative of the influence of alcohol.

*Id.*

test."[12] (Emphasis added.) Taking into account Deputy's testimony regarding her training and qualifications, we cannot say the trial court abused its discretion in finding a foundation had been laid for her testimony regarding the results of Ostdiek's HGN test.

■ For Deputy to have properly administered the HGN test, this requires:

(1) that the test be conducted by requiring a suspect to follow an object such as a finger, pencil or pen with his eyes as the object is moved laterally along a horizontal plane to the periphery of the suspect's vision, and (2) that the indicators be interpreted and scored, one eye at a time, as follows: (a) the person administering the test is to observe how smoothly a suspect follows the object as it is moved to the periphery of the suspect's vision. Jerking of the eyes rather than the ability to follow the object smoothly indicates the influence of alcohol; (b) the person administering the test is to observe whether or not a distinctive jerking occurs in the eyes at the maximum point of deviation when the eye moves to the far periphery of vision. Distinctive jerking is indicative of the influence of alcohol; and (c) the person administering the test is to observe the angle at which nystagmus occurs. Nystagmus occurring at or before the eye is looking at a 45–degree angle is indicative of the influence of alcohol.

*Hill,* 865 S.W.2d at 704; *see also Rose,* 86 S.W.3d at 99. Deputy testified that she had performed Ostdiek's HGN test in accordance with the training she had received and that Ostdiek exhibited all three clues of nystagmus, indicating that he was intoxicated. She was also able to identify and go into detail on all three clues for HGN that she was looking for that night[13] and what the indications of nystagmus were. Further, she was able to break down each part of the HGN test into time intervals and explain, in particular, how she was able to determine the forty-five degree angle when examining maximum deviation nystagmus, even though she did not have the precise starting distance for the test.[14] The transcript clearly reveals that the HGN test was properly administered on Ostdiek. Thus, a sufficient foundation was laid for the admission of Deputy's testimony regarding the HGN test results. Point III is denied.

### Point IV

■ In Point IV, Ostdiek claims the trial court erred in admitting the results of his breathalyzer test over his objections, because neither Sergeant St. John nor Deputy possessed the requisite permits or authorization required to perform the tasks. Specifically, Ostdiek contends Executive Order 07–05, which became effective on August 28, 2007, and was in effect at the time of his arrest, transferred authority and power over Missouri's Breath Alcohol Program ("BAP") from the De-

12. Deputy testified that she had received at least twenty-four hours of field sobriety test training.

13. Deputy's testimony was as follows:
Q. [Mr. Eastman]: What are the three clues on the horizontal gaze nystagmus test?
. . . .
A. [Ms. Ryder]: The three clues on the horizontal gaze nystagmus would be lack of

smooth pursuit, distinct and sustained at maximum deviation, and nystagmus onset at prior to 45 degrees.

14. Deputy testified that she held the stylus between 12–15 inches from Ostdiek's face during the HGN test and that she was able to determine a forty-five-degree angle from that distance by moving the stylus for four seconds in a straight line away from the head.

partment of Health and Senior Services ("DHSS") to the Department of Transportation ("MoDOT"), and, thus, the permits issued by the DHSS to Sergeant St. John and Deputy to use and maintain the evidential breath-testing device were invalid when Ostdiek's breath test was administered. Because the permits were invalid, Ostdiek contends that the results of the breathalyzer test should not have been admitted into evidence and that without the test results, there was insufficient evidence from which the trial court could find him guilty of driving while intoxicated.

"The admissibility of evidence lies within the sound discretion of the trial court and will not be disturbed absent abuse of discretion." *Nelson*, 9 S.W.3d at 603. Such abuse occurs when the trial court's ruling is clearly against the logic of the circumstances and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration. *Id.* at 604.

■ The process of introducing blood alcohol analysis into evidence has been formalized in the provisions of Chapter 577. *Potts v. State*, 22 S.W.3d 226, 230 (Mo.App.2000). Chapter 577 requires the "state department of health and senior services [to] approve satisfactory techniques, devices, equipment, or methods to be considered valid pursuant to the provisions of sections 577.019 to 577.041 and [to] establish standards to ascertain the qualifications and competence of individuals to conduct analyses and to issue permits which shall be subject to termination or revocation[.]" § 577.020.4. "The chemical analysis of a person's blood alcohol content is admissible as evidence and a blood alcohol content of 0.08% is prima facie evidence of intoxication when the chemical analysis is 'performed as provided in sections 577.020 to 577.041 and in accordance with methods and standards approved by

[DHSS].'" *State v. Ross*, 344 S.W.3d 790, 792 (Mo.App. W.D.2011) (quoting § 577.037.1, .4).

■ Before the breathalyzer test results can be admitted into evidence, "the [S]tate must demonstrate absolute and literal compliance with statutory provisions contained in Chapter 577 regulating the manner in which blood alcohol tests are administered[.]" *State v. Regalado*, 806 S.W.2d 86, 88 (Mo.App.1991). To lay a proper foundation for the admission of the breathalyzer test results, therefore, the State must show that the test was executed: "(1) by following the approved methods and techniques of the Department of Health; (2) by a person holding a valid permit; and (3) on equipment and devices approved by the Department of Health." *Potts*, 22 S.W.3d at 230 (quoting *Wisdom v. Dir. of Revenue*, 988 S.W.2d 127, 129 (Mo.App.1999)).

On January 30, 2007, Governor Matt Blunt issued Executive Order 07–05, which was to take effect no earlier than August 28, 2007. *See Schneider v. Dir. of Revenue*, 339 S.W.3d 533, 535 (Mo.App.2011). Executive Order 07–05 was a reorganization plan directing:

[DHSS] and [MoDOT] *to cooperate* to:

1. Transfer all the authority, powers, duties, functions, records, personnel, property, contracts, budgets, matters pending, and other pertinent vestiges of Breath Alcohol Program from [DHSS] to [MoDOT], by Type 1 transfer, as defined under the Reorganization Act of 1974; and

2. Develop mechanisms and processes necessary to effectively transfer the [BAP] to [MoDOT]; and

3. Transfer the responsibility for staff support for the [BAP] from [DHSS] to [MoDOT]; and

4. Take the steps necessary to maintain compliance with federal requirements, so as not to jeopardize federal financial participation with this consolidation.

(Emphasis added.)

Subsequently, on September 12, 2008, Governor Blunt issued Executive Order 08–29, which was intended to reverse the transfer process from DHSS to MoDOT, as initiated by Executive Order 07–05. *See Ross*, 344 S.W.3d at 792–93. "Executive Order 08–29 stated that 'unforeseen administrative issues with the transfer made by Executive Order 07–05 ha[d] made the transfer inefficient and not cost effective' and indicated that '[DHSS] continues to administer [the BAP].'" *Id.* (quoting Executive Order 08–29). The Executive Order was to transfer all powers of administering the BAP that had been acquired by MoDOT back to DHSS. *Id.* However, because the order was submitted during a special session of the legislature, rather than a regular session, it was ineffective. *Id.* Thus, Executive Order 07–05 remained in place.

On January 29, 2010, Governor Jay Nixon issued Executive Order 10–15, directing MoDOT to transfer all powers of administration over the BAP back to the DHSS. *Id.* "The Order declared that '[DHSS] has the necessary expertise to administer [the] BAP.'" *Id.* (quoting Executive Order 10–15). Executive Order 10–15 became effective August 28, 2010, and reversed Executive Order 07–05. *Id.*

Ostdiek was arrested and charged with driving while intoxicated on April 17, 2009. Following his arrest, at the request of Deputy, Ostdiek was given a breathalyzer test utilizing DataMaster number 201244. Deputy had been issued a Type III permit on April 10, 2008, by DHSS, authorizing her to operate a DataMaster breath-testing device in accordance with the provisions of sections 577.020–577.041. Another officer, Sergeant St. John, pursuant to a Type II permit issued to him by DHSS in April of 2007, had performed a DataMaster Maintenance Report, comprising of a maintenance check and verification, on April 15, 2009, on the DataMaster 201244. Ostdiek's post-arrest breathalyzer test results of .114%, registered on the DataMaster 201244 by Deputy, were admitted at trial over Ostdiek's objection.

Ostdiek argues that Executive Order 07–05, upon its effective date, abrogated and removed the authority of DHSS to administer the BAP program and invalidated all previous rules, regulations, and permits promulgated and issued by DHSS. Thus, he argues Deputy held no permit issued under the authority of MoDOT and, instead, her purported authority was derived from DHSS, which had no issuance authority at the time that her permit was issued. He also argues that Sergeant St. John held no permit or authority from MoDOT to maintain or perform a maintenance check on the DataMaster 201244, because the permit was originally issued by DHSS, even though it was issued prior to the effective date of Executive Order 07–05.

Both this court, in *Ross*, and the Eastern District, in *Schneider*, recently considered the effects of Executive Order 07–05 on the admission of breathalyzer results under almost identical situations. In *Schneider*, Schneider contended the breathalyzer tests were inadmissible because the test was performed by a police officer holding a permit issued by DHSS while Executive Order 07–05 was in effect. *Schneider*, 339 S.W.3d at 535–36. Schneider, like Ostdiek, argued that the issued permit was not valid because Executive Order 07–05 had transferred all BAP-related authority from DHSS to MoDOT, and MoDOT had *not* issued a permit to the officer under its own regulations for

conducting breathalyzer tests. *Id.* at 536. The *Schneider* court analyzed the language of Executive Order 07–05, which instructed DHSS and MoDOT "to cooperate to ... [t]ransfer all the ... pertinent vestiges of the [BAP] from [DHSS] to [MoDOT]" and "[d]evelop mechanisms and processes necessary to effectively transfer [BAP] to [MoDOT]," and concluded that the words "develop" and "processes" "clearly contemplate[ ] a gradual effort resulting in DHSS's transfer of the BAP to MoDOT." *Id.* at 536–37.

In addition, the court found that the word "effectively" in front of the word "transfer" stressed the importance of maintaining the BAP while the transfer process took place. *Id.* at 537. The court upheld the trial court's admission of Schneider's breathalyzer results explaining, "an executive order requiring two agencies 'to cooperate to ... [d]evelop mechanisms and processes to effectively transfer' the operation of the BAP cannot be logically construed to immediately transfer the operation of the BAP on a certain date," because "Governor Blunt clearly intended a process that maintained the continuity of the operation of the BAP." *Id.*

In *Ross,* the police officer held a Type II permit, issued by DHSS on December 3, 2007, allowing him to operate and maintain the breathalyzer device used to test Ross's blood alcohol content. 344 S.W.3d at 794. Ross argued that the issued permit was not valid because it was not issued by MoDOT, as required by Executive Order 07–05. *Id.* at 792. The *Ross* court relied on *Schneider* to come to the same conclusion, that the breathalyzer results were properly admitted into evidence by the trial court. *Id.* at 794. The court explained:

> Executive Order 07–05 on its effective date did not result in an immediate transfer of BAP-related authority from DHSS to MoDOT. The order merely authorized the process of the transfer, which was never fully implemented by the agencies. Thus, the fact that [a police officer's] permit was issued by DHSS rather than MoDOT and the fact that MoDOT did not promulgate its own BAP-related rules does not render [a defendant's] implied consent to breathalyzer testing invalid as a matter of law.

*Id.*

We agree with the Eastern District's analysis and conclusion in *Schneider,* and this court's analysis and conclusion in *Ross.* The circuit court did not err in admitting the results of Ostdiek's breathalyzer test. Point IV is denied.

### Conclusion

For the foregoing reasons, we reverse Ostdiek's judgment of conviction and his sentence for speeding. We affirm the judgment of conviction for driving while intoxicated and for possession of drug paraphernalia.

All concur.